ANN LEE, AS ADMINISTRATRIX OF JOHN LEE, DECEASED, RESPONDENT, *v.* THE VACUUM OIL COMPANY, APPELLANT.

*Negligence in not inspecting oil pipes used for the transportation of oil — such pipes are not, per se, a nuisance.*

The pipe of an oil company, used for the transportation of its oil, was laid within a few feet of a street sewer connecting with other city sewers. A city contractor, in constructing a city sewer, exposed a section of the pipe, and in blasting rock struck and broke it apart at one of the joints, from which broken joint, some fourteen days thereafter, oil, which was pumped into the pipe, escaped and caused an explosion, causing personal injuries resulting in the death of the party injured.

There was no evidence of negligence on the part of the company in the mode and manner of laying the pipe, or knowledge on its part of the injury done to it, but it had neglected to inspect the same, for the purpose of ascertaining if it was in proper condition, for the aforesaid period of fourteen days, at the end of which time the pumping of oil into this pipe was continued for a period of two hours and a half before the party at the pumping station was notified, by the employees of the company at the other end of the pipe where the oil was to be discharged, of the fact that no oil was being discharged therefrom at the latter point.

In an action brought for the recovery of damages resulting from such death:

*Held,* that the question of negligence on the part of the company was properly submitted to the jury.

That the laying and maintaining of the pipes for the transportation through them of oil did not, *per se,* constitute a nuisance.

APPEAL from a judgment entered on a verdict, rendered in the plaintiff's favor on a trial at the Monroe Circuit before the court and a jury for the sum of $5,000, in the office of the clerk of Monroe county December 31, 1888, and from an order, entered on the same day, denying the defendant's motion for a new trial founded on a case containing exceptions.

The plaintiff was the administratrix of the estate of John Lee, deceased, who died on the 21st day of December, 1887, in consequence of injuries received on that day by the explosion of gas in a building in which he was employed as a laborer by the occupant. It was alleged that his death was caused by the negligence of the defendant; and it was claimed that it was liable for such damages as the next of kin of the deceased had sustained in consequence of his death, as provided in sections 1902 and 1903 of the Code of Civil Procedure.

*Theodore Bacon,* for the appellant.

*William F. Coggswell,* for the respondent.

BARKER, P. J.:

The defendant is engaged in the manufacture of oils from crude petroleum. In the process there is produced a fluid substance called "naphtha," which, at the low temperature of thirteen degrees Fahrenheit, gives off vapor or gas which is inflammable and explosive when confined. Its explosive power is estimated to be equal to 140 pounds to the square inch.

The defendant's works are located in the city of Rochester on or near the bank of the abandoned Genesee canal. The Municipal Gas Company is engaged in the manufacture and distribution for consumption of illuminating gas consumed in the city of Rochester. Its works are also situated on the banks of said canal, nearly a mile and a half north of the defendant's works. The latter company use naphtha in the manufacture of gas, consuming each month about 30,000 gallons, and the defendant supplies the same. Each company

stores such quantity as it may have on hand in iron tanks. The naphtha sold by the defendant to the gas company is transported from its tanks to the gas company's tank by pumping it through a three-inch wrought-iron pipe. The grade on which the pipe is laid is such that naphtha will not flow to the gas company's receiving tank by force of gravitation. The pipe is laid in the bed of the canal and passes under Atkinson street and under the Atkinson street bridge which crosses the canal. At that point the pipe is laid within a few feet of the street sewer, which connects with other sewers running in a northerly direction, and at some distance therefrom, and discharges into the Genesee river under the building destroyed by the explosion. The sewer passing under the building was open so that gas could escape into and be distributed through the same.

Naphtha was delivered to the gas company for the purposes mentioned every two weeks, and from twelve to fifteen thousand gallons at each delivery, taking from three to four hours to pump that quantity through the pipe. During the intervening time the pipe was filled with naphtha, the quantity being about 2,000 gallons. The defendant had acquired the consent of the parties owning the bed of the canal to lay the pipe therein for the uses and purposes for which it was intended. A steam railroad track was also laid along the bed of the canal, and the pipe in question was laid by the side of, and, in some places, under the said track.

No time will be taken to prove that the business of transporting naphtha by the means adopted, from and to the place mentioned, and on the line adopted, was a lawful business, for that proposition cannot be reasonably disputed. The means adopted to transport this substance from one point to another is practically the same as the system in use for distributing illuminating gas, produced from coal, in all cities where it is used, and the danger to life and property in the aggregate are no greater, if they cannot be said to be less. The legislature has authorized the formation of corporations for "the purpose of constructing and operating, for the public use, lines of pipe for the conveying or transporting therein petroleum, gas, liquids, or any products or property" (chap. 203 of 1878), and such corporations may lay pipes across and along public streets and highways, and institute proceedings to condemn lands and acquire the right to lay and construct lines of pipe when they are unable to negotiate

for that privilege with the owner. This law was not enacted for the purpose of making legitimate a business which, prior thereto, was condemned as unlawful and contrary to public policy. The chief purpose of this act was to provide for the creation of corporations, to carry on a lawful business, in a manner and by the means which theretofore were proper and lawful for any individual or company of persons to do, using due care in the management of the same.

The real question presented is, was the evidence sufficient to sustain the charge imputing negligence to the defendant, in the mode and manner of laying the pipe, or in neglecting to inspect the same to see if it remained in a safe and secure condition, or in failing to detect that it was broken and unfit for use, on the day the accident occurred, in time to have prevented the escape of naphtha in such quantities as to become dangerous to life or property? The pipe was constructed from prime material, by an approved process, by manufacturers of experience, and had sufficient strength for the transportation of naphtha, and was well adapted for that use, between the places mentioned, under the pressure applied for pumping, and was well laid and properly covered with earth. It had been in use several years, and there is no evidence that its original strength had been wasted in any perceptible degree by use. The test which was made, after the accident, of the section of the pipe which was broken fully sustains this statement. The last time the pipe was used before the accident was on the 7th day of December 1887, on which day about twelve thousand gallons of naphtha were successfully pumped through the pipe without any indication that the same was not in perfect order. There is no serious claim made by the plaintiff that the pipe was not in good order, and safe for use on that day.

The question of the defendant's negligence is to be determined mainly by what occurred after the day named, in connection with the charge made by the plaintiff, that the defendant's agents and servants in charge of the line failed, by reason of their carelessness and indifference, under the circumstances, to discover that the line was broken, so that all the oil pumped was discharged and wasted. On and prior to the said seventh day of December the city was constructing a sewer in Atkinson street, which was intended to connect with the then existing sewer, which passed under the bridge, which carried Atkinson street over the canal. The contractors constructing the

sewer in their operations exposed a section of the pipe for several feet, and in blasting rock a fragment struck the pipe and bent it at that point, which resulted in breaking or pulling it apart at one of the joints, so as to discharge near the sewer all the naphtha that was in or might be pumped into the pipe. This occurred on the eighth of December, one day after the pipe was last used for transporting naphtha to the gas company's tank. The soil at or near where the pipe was broken was such as to permit of a ready flow of naphtha between the broken end of the pipe and the sewer. Each way from the place of fracture the pipe was laid on an ascending grade, so that its contents at once discharged, but it is not claimed that any of the naphtha which was in the pipe, and which must have escaped immediately after the break, caused the explosion. The defendant's servants made no inspection of the line between the seventh day of December and the day of the accident, which was on the twenty-first day of the same month, for the purpose of ascertaining if it was in good order and suitable for use, nor had it been its custom to make an inspection for that purpose.

On the day of the accident the defendant had an order from the gas company to deliver to it 15,000 gallons of naphtha. Wilson and Sweeny, two of the defendant's servants, who had charge of the pumps and the pipe line, undertook to make the delivery. As it was customary with them they agreed upon the precise time when the pumps should be started, which on this occasion was ten minutes past twelve, M., and time enough was allowed to permit Sweeny to go from the defendant's works to the gas company's tank and measure the quantity of naphtha which was then stored therein, and to open the stop-cocks before the time for starting the pumps should arrive, as agreed upon. Sweeny did reach the receiving tank and opened the stop-cocks before Wilson started the pumps, which he did at the time agreed upon, and he continued to operate the same until he had pumped into the pipe 12,000 gallons, which took about two hours and a half before he was notified that the pipe was broken, and none of the oil reached the receiving tank. Sweeny remained at the receiving tank for two hours and twenty minutes watching all the time to see if the naphtha came, and as none was received he then notified an officer of the gas company, who immediately, by telephone, notified the defend-

ant's business office that no naphtha was being delivered, and the pumping was immediately stopped. About an hour thereafter the explosion took place.

It does not distinctly appear how soon after the pumping commenced that the naphtha reached the sewer, but gas was emitted, from naphtha running into the sewer, as early as one o'clock, and the several explosions which took place, including the one in the building where the deceased lost his life, as early as about three o'clock thirty minutes in the afternoon.

In view of the danger likely to arise to life and property from the use of a broken or defective pipe, in the locality where this was laid, so that naphtha in considerable quantities might escape, a case was made for the consideration of a jury, with proper instructions as to the rules of law applicable to the case. When safety of human life is in question, a very high degree of care is required in conducting a lawful business. If naphtha in large quantities should be discharged at most any point on the line of the pipe, it would be highly dangerous to property situated in close proximity thereto, and, also, to occupants of buildings in the immediate vicinity, as well as to individuals passing on the public streets. The learned trial judge instructed the jury, in substance, that the transportation of naphtha, by means of a pipe located on the line selected, was not, as matter of law, a nuisance, but it was for them to determine, from all the evidence in the case, whether it was a nuisance as a matter of fact; and if they came to the conclusion that it was a nuisance, then the defendant was liable for any damage which came from the explosion, without regard to the question whether the defendant was negligent or not. In this connection he also instructed the jury that if they came to the conclusion that it was not a nuisance, it did not necessarily follow that the plaintiff had failed to maintain a cause of action. We are unable to discover in the facts, about which there is really no dispute, those elements of danger which justified the court in submitting the case to the jury for them to determine, whether or not, as a matter of fact, the defendant was guilty of maintaining a nuisance by transporting naphtha through the pipe, or by leaving the pipe full of the same material when the pump was not in use. The pipe was in good order, and safe for the trans-

portation of this substance on this line, and it was lawful for the defendants to engage in that business. There is no evidence showing that there was any leakage of naphtha from the pipe, or that gas escaped therefrom, while naphtha was being pumped or during the time the pumps were not in use. These facts being conceded, we fail to discover any fact upon which the charge of maintaining a nuisance can be founded. It is no more dangerous to life or property to convey naphtha in a strong and secure pipe through a populous city than it is to distribute manufactured or natural gas by the same means. Gas thrown off from a body of naphtha is no more inflammable or explosive than coal gas, and either kind must be in some degree confined before the explosion will occur. The rule is of uniform application that while a man may prosecute such business as he choses on his own premises, he has no right to erect and maintain a nuisance to the injury of an adjacent proprietor or of his neighbors, even in the pursuit of a lawful trade. (*Heeg* v. *Light*, 80 N. Y., 579.)

A private nuisance is defined to be anything done to the hurt or annoyance of the lands, tenements or hereditaments of another. (3 Blackstone's Com., 216.) Any unwarrantable, unreasonable or unlawful use by a person of his own property, real or personal, to the injury of another, comes within the definition stated, and renders the owner or possessor liable for all damages arising from such use. (Wood's Laws of Nuisances, § 1 and authorities cited.) To constitute a nuisance for keeping in store articles in common use in a community, the substance must be of such a nature and kept in such large quantity and under such circumstances as to create real danger to life and property. This rule seems to be fairly deducible from the many decisions which have been made by the courts on this subject. The fears of mankind will not alone create a nuisance without the presence of real danger. " The well-founded apprehension of danger, which would alarm men of steady nerves and reasonable courage passing through the streets in the locality where the business is carried on, is enough to show that something is being done which ought to be prevented by condemning it as a misdemeanor." (*Regina* v. *Lister*, 3 Jurist [N. S.], 570 ; *People* v. *Sand*, 1 Johns., 78 ; *Myers* v. *Malcom*, 6 Hill, 292 ; *Heeg* v. *Light*, 80 N. Y., 579.) In such a case the rule which exonerates a party engaged in a lawful business, when free from negligence, has no application.

In another part of his charge the learned judge instructed the jury that if they " should come to the conclusion that the defendant was in the act of carrying on a nuisance, and also that this pipe was a sufficiently good pipe, but was broken by the act of a wrong-doer, under such circumstances as that the defendant had no right to expect that it would be broken, and under such circumstances as that the defendant was not guilty of any negligence in not discovering that it was broken, but that it had every reason to believe that it had taken every precaution that a reasonably prudent man would have done to make this safe, and, in fact, had done so, if you come to the conclusion that was the state of affairs, then, although the defendant was guilty of carrying on a private nuisance, it would not be liable for this accident that happened.

These instructions were to the effect that if the defendant was maintaining a nuisance, it was not liable if the pipe was broken by the act of a wrong-doer, if the defendant was not guilty of negligence in the particulars mentioned. But it does not cure the error or leave it to the jury for them to say whether the defendant was guilty or not of maintaining a nuisance, but for a reason which will be hereafter stated, it becomes unnecessary to consider how far the last instructions qualified those as given, relative to the defendant's liability, if the jury found that it was maintaining a nuisance.

As an independent ground for a recovery it was submitted to the jury whether the defendant was guilty of negligence in failing to ascertain by an actual inspection of the line of pipe, or by some other means, that it was broken and unfit for use before they commenced pumping on the twenty-first day of December, or that the defendant's agent, Sweeny, who was stationed at the gas company's tanks, in failing to give notice that naphtha was not passing through the pipe, in time to have prevented the escape of naphtha in sufficient quantities to be dangerous. Our comprehension of the case is that a case was made for the consideration of the jury on the question of the defendant's negligence. Every fact and circumstance must be considered and reflected upon in determining the question submitted to the consideration of the jury. As the pipe was in a reasonably safe and secure condition up to the time it was broken by the act of a third person, the charge of negligence rests mainly, if not entirely, on the omission of the defendant's agents and ser-

vants to do those things which, if done, would have disclosed the actual condition of the pipe before any considerable quantity of naphtha could have escaped. One test, for the purpose of considering whether the pipes were in order or not, was to have arranged that the pumps should have been started before the stop-cocks at the receiver were opened; and if that had been done the broken condition of the pipe would have been disclosed to the engineer at the pumping station immediately, as the degree of resistance would have indicated that the naphtha was escaping somewhere on the line of the pipe. The failure of Sweeny to give notice to those in charge of the pumping station that no naphtha was being delivered into the receiving tank, immediately after the time agreed upon for starting the pumps, subjects him to the charge of being guilty of negligence which caused the death of the deceased. It was his duty to act upon the assumption that the pumps would be started at the time agreed upon, and that oil would be immediately discharged into the receiving tank, and as none came through the pipe it was an indication on which any prudent and reasonably cautious man would have concluded that the pipe was out of order. By use of the telephone in the gas company's office, which was connected with the defendant's office, he could have communicated with the engineer at the pumping station, informing him that no naphtha was being discharged into the receiving tank, in time to have averted the accident.

The fact that the pipe crossed several streets and, for a portion of the way, was laid under the track of a railroad which was in constant use, was a circumstance indicating that it was an act of prudence to make some sufficient tests to ascertain if the pipe was in a safe condition, immediately preceding the use of the same, for the transportation of a large quantity of naphtha. In face of all the facts and circumstances, we think the question was properly submitted to the jury for them to determine whether the defendant's agents engaged in operating the pipe line were guilty of negligence.

The jury rendered a general verdict in the plaintiff's favor of $5,000, and there was also submitted to them to answer this question: "Was the naphtha which caused the explosion on the 21st day of December, 1887, by which John Lee was killed, permitted to get into the sewer by the negligence of the defendant?" which was

answered in the affirmative. As the defendant's negligence was established in the opinion of the jury, as indicated by their special verdict, the error in submitting the question to the jury whether the defendant was maintaining a nuisance should not prevail for the purpose of reversing the judgment, for the defendant's liability was established irrespective of the question of nuisance. For the same reason, if there was any error of the court in ruling that the defendant was guilty of violating the provisions of chapter 773 of the Laws of 1865, regulating the storage and keeping of crude petroleum or any of its products within the corporate limits of any city within this State, it should not prevail for the purpose of securing a new trial.

The defendant's counsel asked the court to charge the jury that, if at a time when Sweeny should reasonably have been required to give notice that no naphtha was coming, the discharge into the sewer was so great as to cause the disaster, this failure to report was not negligence such as to authorize a verdict for the plaintiff. If the jury could, from the evidence, have determined the quantity of naphtha which, in fact, had at that time been discharged into the sewer, there is no evidence which would enable them to say that the quantity was sufficient to have caused the explosion. It is manifest that a considerable quantity must have been discharged from the pipe at the break before any would have been discharged into the sewer by reason of the character of the earth which lay about the pipe where it was broken. It is wholly conjectural as to the precise time when naphtha was first discharged into the sewer. We think that the proposition, as stated, was faulty and properly rejected, for the reason that it was the duty of the jury to determine the question of negligence from all the facts and circumstances of the case, and there were others bearing upon the question besides the omission of Sweeny to give notice that naphtha was not being received at the tank.

The defendant's counsel also asked the court to charge the jury that if they should find that the sole cause of the accident was the breaking of the pipe by blasting at Atkinson street by the interference of third persons without knowledge or notice on the part of the defendant, or any co-operating negligence on the part of the defendant, they must render a verdict for the defendant. We think it is plain that the defendant was not entitled to these instructions. It was a conceded fact in the case that the pipe became broken by

reason of the interference of third parties, and without any actual knowledge or notice on the part of the defendant at the time the pumping was commenced on the day of the accident, and the plaintiff seeks to maintain her right of action from facts and circumstances wholly independent of and distinct from those mentioned in the first part of the request. We do not need, therefore, to inquire in what sense the term "co-operative negligence" was used in the alternative part of the request.

Exceptions were taken by the defendant to the reception and rejection of items of evidence which were considered by the Special Term and held not to be well taken, and we concur in this part of the written opinion of the learned judge as printed in the case.

The judgment and order should be affirmed.

Dwight, J., concurred; Macomber, J., not voting.

Judgment and order affirmed.